UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO: 5:20-CV-198

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | COMPLAINT |
| v. | ) | |
| | ) | |
| MARK RAYFIELD BROWN, JR., | ) | |
| AYANNA CARR-BROWN, MICHELE | ) | |
| GIBBONS-CARR, AND RICHARD D. | ) | |
| CARR | ) | |
| | ) | |
| Defendants. | ) | |

The United States of America, by and through the United States Attorney for

the Eastern District of North Carolina, complains of the defendants, and says:

## I.     PARTIES, JURISDICTION, AND VENUE

1.     This is a civil action brought by Plaintiff United States of America

("United States") against Defendants Mark Rayfield Brown, Jr. ("Mark Brown"),

Ayanna Carr-Brown ("Ayanna Carr-Brown"), Michele Gibbons-Carr ("Dr. Gibbons-

Carr"), and Richard D. Carr ("Dr. Carr").

2.     Mark Brown is a resident of Wake County, North Carolina, within the

Eastern District of North Carolina.  Mark Brown was prosecuted and convicted in the

Eastern District of North Carolina for conspiracy to commit healthcare fraud, and

was ordered by this Court to pay $445,480.00 in restitution.  United States v. Mark

Brown, No. 5:16-CR-326-1FL.  This action is an effort to enforce that criminal

1

judgment pursuant to 18 U.S.C. § 3613(a) and (f), 18 U.S.C. § 3664(m), 28 U.S.C. § 3202(a) and (e), and 28 U.S.C. § 3306.

3. Defendant Ayanna Carr-Brown is a resident of Wake County, North Carolina, within the Eastern District of North Carolina. Ayanna Carr-Brown is the wife of Mark Brown (collectively, "Browns").

4. Defendants Dr. Carr and Dr. Gibbons-Carr (collectively, "Carrs") are residents of Norfolk County, Massachusetts. Dr. Carr is the father of Ayanna Carr-Brown, and Dr. Gibbons-Carr is the stepmother of Ayanna Carr-Brown.

5. The government's allegations center on Mark Brown's fraudulent transfers of funds used to pay for construction of an in-law suite located at 2009 Falls Forest Drive, Raleigh, North Carolina ("Falls Forest Property"), which is in Wake County, North Carolina, within the Eastern District of North Carolina. The Carrs purportedly own the Falls Forest Property. The government's allegations also involve Mark Brown's fraudulent transfers of funds to the Carrs under the guise of loan payments related to the real property located at 1101 Fanning Drive, Wake Forest, North Carolina ("Fanning Drive Property"), which is in Wake County, North Carolina, within the Eastern District of North Carolina. The Browns previously owned the Fanning Drive Property.

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1345 because the United States is the Plaintiff.

7. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391, 1395, and 3004. Specifically, the criminal acts that led to the debt the United States seeks to

collect occurred in the Eastern District of North Carolina, and the underlying facts of this action arise from activity within this district. Furthermore, the United States has statutory authority to enforce the Court's judgment pursuant to the Federal Debt Collection Procedures Act, which allows for nationwide service and, by corollary, venue in any federal judicial district. Finally, the property at issue in this action is located in the Eastern District of North Carolina.

## II. FACTUAL ALLEGATIONS

### A. Nature of the Action.

8.      In this action, the United States seeks a judgment against the Carrs as a remedy for Mark Brown's fraudulent transfer of $40,000.00 to the Carrs, which Mark Brown made to the Carrs in multiple payments between May 2014 and May 2018. Those fraudulently transferred funds were used to repay a loan that the Carrs (not the Browns) took out and secured with a property located in Wellesley, Massachusetts that the Carrs (not the Browns) own, in order to pay for the construction of an in-law suite that the Carrs (not the Browns) use at the Falls Forest Property that the Carrs (not the Browns) purportedly own. Additionally, the United States seeks a judgment against the Carrs as a remedy for Mark Brown's fraudulent transfer of at least $32,725.62 to the Carrs under the guise of "loan payments" made from July 2016 to May 2018, and that exceeded any amounts the Browns owed them for the Fanning Drive Property. As a result of these fraudulent transfers, the United States seeks a judgment in the amount of at least $72,725.62 against the Carrs, jointly and severally, in addition to other relief as set forth below.

3

**B. The Carrs' Purchase of the Falls Forest Property.**

9.     In January 2008, the Browns purchased the Fanning Drive Property, with a loan from EquiFirst Corporation.

10.     Sometime between 2010 and 2011, the Browns and the Carrs decided they would purchase a property together where they could all live.

11.     In February 2011, the Carrs entered into a contract to purchase the Falls Forest Property for $825,000.

12.     Upon information and belief, the offer to purchase the Falls Forest Property was contingent on the sale of the Fanning Drive Property. Accordingly, in early 2011, the Browns entered into an agreement with North State Bank to sell the Fanning Drive Property for $450,000. At the time the Browns entered into this agreement, their outstanding mortgage on the Fanning Drive Property was at least $544,000.00, creating negative equity in the property. Because the debt on the property exceeded the sales price, the Browns had to bring cash to the real estate closing.

13.     On March 25, 2011, Ayanna Carr-Brown sent an email to Dr. Gibbons-Carr requesting a loan. The email indicated that the payoff amount for the Browns' mortgage on the Fanning Drive Property was $542,599, and that the Browns needed to borrow $67,599 to complete the sale of the Fanning Drive Property. A copy of the Ayanna Carr-Brown email is attached as Exhibit A, and incorporated herein by reference.

4

14. The Carrs provided the Browns $67,599 to pay the Browns' outstanding mortgage balance when they closed on the sale of the Fanning Drive Property ("Fanning Drive Property Loan").

15. Upon information and belief, the Browns never agreed in writing to repay the Fanning Drive Property Loan. There was no written loan agreement memorializing repayment terms or interest on the Fanning Drive Property Loan.

16. On April 7, 2011, the Browns sold and deeded the Fanning Drive property to North State Bank.

17. Also, on April 7, 2011, the Browns entered into an installment contract ("Installment Contract") with the Carrs to purchase an interest in the Falls Forest Property. The Installment Contract is attached as Exhibit B, and incorporated herein by reference.

18. The Browns were unable to obtain a mortgage in their own name due to poor credit.

19. The Carrs paid part of the purchase price of the Falls Forest Property in cash, and the remaining balance was financed through two loans that the Carrs obtained from North State Bank. The first was a first-mortgage loan in the principal amount of $417,000, and the second was a purchase-money home equity loan in the principal amount of $58,000. The aggregate amount of the loans the Carrs received from North State Bank for the purchase of the Falls Forest Property was $475,000.

20. Under the Installment Contract, the Browns agreed to pay the Carrs' loans on the Falls Forest Property (with an aggregate principle amount of $475,000)

5

in full within ten years of the Installment Contract date.  <u>See</u> Ex. B at 1.  In exchange, the Carrs agreed to convey a deed to the Browns for the interest acquired in the Falls Forest Property when the two loans secured by the property were paid in full.

21.     Under the Installment Contract, the interest the Browns acquired in the Falls Forest Property would be equal to the principal amount of the loans from North State Bank ($475,000), divided by the amount the Carrs paid to purchase the Falls Forest Property ($825,000) plus the costs of any improvements (as it turns out, $250,000 for the Carrs' in-law suite) – that is, 44.19 percent.  <u>See</u> Ex. B at 1.

22.     In addition to paying the Carrs' loans from North State Bank, the Browns were also required to pay the homeowner's insurance premiums and real estate taxes for the Falls Forest Property, despite that the property was titled in the Carrs' names.  <u>See</u> Ex. B at 3.

23.     Under the Installment Contract, if the Browns failed to make a monthly payment for the loans from North State Bank, and the payment remained delinquent for more than sixty days from the due date, the Carrs had the option to accelerate the entire outstanding balance due under the Installment Contract, and to declare the entire balance due and payable immediately.  <u>See</u> Ex. B at 2.

24.     North State Bank sold the Carrs' loans to BB&T shortly after the Carrs purchased the Falls Forest Property.

25.     Between April 2011 and September 2018, the Browns' monthly payment to the Carrs ranged between $3,900 and $4,125.  The Browns' monthly payment to

the Carrs increased over time due to the change in the mortgage and the increased costs associated with homeowner's insurance and real estate taxes.

26.     Under the Installment Contract, the Browns had the option to make their monthly payment directly to the Carrs or directly to the lender. The majority of the payments were drawn against the joint bank account of the Browns, and the checks were endorsed by Mark Brown. See Ex. B at 2.

27.     The Browns made the majority of their monthly payments under the Installment Contract by going to a North State Bank branch location and depositing a check into the Carrs' bank account. On a few occasions, the Browns submitted payment directly to BB&T, the institution that purchased the note from North State Bank.

28.     The Falls Forest Property has been the Browns' primary residence since the Installment Contract was entered into. Upon information and belief, it has never been the Carrs' primary residence.

**C.     Construction of the In-Law Suite at the Falls Forest Property.**

29.     Wanting space at the Falls Forest Property for themselves, the Carrs financed the construction of an in-law suite in 2011 for their exclusive use.

30.     The cost of constructing the Carrs' in-law suite was around $250,000.

31.     The Carrs (not the Browns) took out a $150,000 loan secured by a property in Wellesley, Massachusetts owned by the Carrs (not the Browns), to fund the construction of the in-law suite, which is used exclusively by the Carrs (not the

7

Browns).  The Carrs paid for the remaining costs of the in-law suite from their investment accounts.

32.    The Carrs (not the Browns) contracted with the builder and designed the in-law suite, without input from the Browns.

33.    In addition to having separate security systems, the Carrs' in-law suite and the main house on the Falls Forest Property have different cable and internet providers.

34.    The Carrs pay for the cable, internet, and security system in their in-law suite, while the Browns separately pay for the cable, internet, and security system used in the main house on the Falls Forest Property.

35.    The Carrs pay one-third of the monthly water and electricity bill for the Falls Forest Property, while the Browns pay the remaining two-thirds.

**D.    The Browns' Payment History to the Carrs.**

36.    Although the Installment Contract was entered into on April 11, 2011, the Carrs claim that the Browns' payments under the Installment Contract did not commence until January 1, 2012.  The Browns made payments to the Carrs from January 1, 2012 through at least May 18, 2018, when the last payment was made prior to Mark Brown's incarceration.  Ayanna Carr-Brown continued to make sporadic payments to the Carrs after Mark Brown's incarceration.  The United States is not seeking to recover the funds transferred to the Carrs by Ayanna Carr-Brown after Mark Brown's incarceration.

8

37.     With slight unexplained deviations, from January 1, 2012 through April 11, 2016, the Browns paid the Carrs $3,900 per month under the Installment Contract. After April 11, 2016, and until May 2018, the Browns' payments to the Carrs increased to $4,125 per month. According to Dr. Gibbons-Carr, the increase was attributable to an increase in real estate taxes and homeowner's insurance premiums.

38.     The Browns consistently made the monthly payments described in the preceding paragraph using checks drawn from the joint bank account of Mark Brown and Ayanna Carr-Brown. The United States has presumed that 100% of the funds in the joint bank account belonged to Mark Brown.

39.     At least one of the payments described in paragraph 37 was made with a check drawn from a Village Life Center, LLC a business account, on which Mark Brown had signature authority.

40.     The majority of the checks (including the one from Village Life Center) were signed by Mark Brown.

41.     Dr. Gibbons-Carr and Ayanna Carr-Brown contend that not until October 2018 did the Browns ever default on a payment under the Installment Contract for more than 60 days. On information and belief, however, the Browns actually defaulted on more than one occasion before October 2018 and the payment remained outstanding for more than 60 days. On information and belief, not until the Browns' interest in the Falls Forest Property was under investigation by the

United States (an investigation about which the Carrs knew) did the Carrs see fit to document one of the Browns' defaults with a default notice.

42.     Dr. Gibbons-Carr contends the Browns' monthly payments to the Carrs under the Installment Contract were allocated to paying: (1) principal and interest on the acquisition loans for the Falls Forest Property; (2) the Browns' portion of the homeowner's insurance premiums on the Falls Forest Property; (3) the Browns' portion of the real estate taxes on the Falls Forest Property; (4) the Browns' portion of the homeowner's association fees on the Falls Forest Property; (5) surcharges; and (6) $800 or $1,000 towards the principal and interest of the secured loan for the Carrs' in-law suite at the Falls Forest Property.

43.     Once the items listed in the preceding paragraph were paid, any remaining money was applied to the Fanning Drive Property Loan.

44.     Although the Installment Contract required the Browns to pay the entire real estate taxes, mortgage interest, and homeowner's insurance for the Falls Forest Property, Dr. Gibbons-Carr claims that the Carrs were responsible for half of the mortgage interest, real estate taxes, and insurance on the Falls Forest Property, and that the Browns were responsible for the other half.  Further, since the payment for these items was escrowed with the monthly mortgage payment, Dr. Gibbons-Carr contends, the Browns paid 100% of these items, and the Carrs allocated the one-half-portion paid on their behalf by the Browns to the outstanding principle balance on the Fanning Drive Property Loan.

45.     There were not any specific debts to which the Browns' monthly payments were applied, other than those identified in paragraphs 42-43 of this complaint, above.

46.     Upon information and belief, the Fanning Drive Property Loan was paid in full by June 2016.  Accordingly, any portion of the Browns' subsequent monthly payments to the Carrs that exceeded the amounts needed to pay the items identified in paragraph 43 of this complaint, above, were fraudulent transfers of cash.  That amount is at least  $32,725.62.

**E.     Mark Brown's Criminal Conduct**

47.     While Mark Brown was fraudulently transferring money used to pay for the Carrs' in-law suite at the Falls Forest Property, and fraudulently transferring to the Carrs amounts exceeding those required to pay for the items identified in paragraphs 42-43 of this complaint, above, he was also conspiring to defraud Medicaid of hundreds of thousands of dollars through Medicaid reimbursements, and thereby incurring a debt to the United States.

48.     In early 2014, after falling on hard times after a failed business venture, Mark Brown had a conversation with Chris Brown (one of Mark Brown's co-conspirators) about purchasing a mental health company.  After the conversation, Chris Brown loaned Mark Brown $20,000 in cash for the purchase of the mental health company.

49.     In April 2014, Mark Brown purchased Christian Medical, Inc. ("Christian Medical"), a North Carolina mental health company that was registered

with the North Carolina Department of Health and Human Services, Division of Medical Assistance.

50.     Christian Medical was purported by Mark Brown to be a provider of outpatient behavioral health services when, in fact, Christian Medical was a shell business with no legitimate operations, and was used and maintained for the sole purpose of defrauding the state Medicaid system.

51.     As a part of the conspiracy to defraud Medicaid, Mark Brown instructed Chris Brown to fraudulently back-bill Medicaid for services that were never rendered, through Christian Medical.

52.     Beginning no later than in or about April 2014, and continuing until at least in or about May 2015, Mark Brown conspired with others to defraud the North Carolina Medicaid system by submitting false and fraudulent claims for reimbursement of services that were not rendered by the billing providers.

53.     Christian Medical submitted at least 8,620 fraudulent reimbursement claims to Medicaid, at the direction of Mark Brown, totaling $533,300 in fraudulent claims, of which $445,480 was paid.  Thus, by May 2015, Mark Brown had incurred a debt to the United States in the amount of $445,480.  Yet, he continued to fraudulently transfer money to the Carrs.

**F.     The Carrs Transfer the Falls Forest Property into the Michele V. Gibbons-Carr Revocable Trust, u/t/d February 12, 2016.**

54.     On February 12, 2016, in the midst of the federal investigation into Mark Brown's criminal activity, Dr. Gibbons-Carr established the Michele V.

12

Gibbons-Carr Revocable Trust Agreement ("Trust"). The trustees for the Trust were Dr. Gibbons-Carr and Dr. Carr.

55. On July 5, 2016, the Carrs deeded their interest in the Falls Forest Property to "Richard D. Carr and Michele Gibbons-Carr, Trustees of the Michele V. Gibbons-Carr Revocable Trust, u/t/d February 12, 2016." A copy of the North Carolina Gift Quitclaim Deed is attached as Government Exhibit C, and is incorporated herein by reference.

56. Dr. Gibbons-Carr claims the transfer of the Falls Forest Property into the Trust was simply part of her estate planning and was independent of the United States' contemporaneous investigation into Mark Brown's criminal conduct.

## G. Mark Brown Pleads Guilty and Is Sentenced for Conspiracy to Commit Healthcare Fraud in the Eastern District of North Carolina.

57. On December 7, 2016, Mark Brown executed a plea agreement with the United States, in which he agreed to plead guilty to a criminal information charging him with conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349. In his plea agreement, Mark Brown agreed "[t]o make restitution to the North Carolina Fund for Medical Assistance in the amount of $445,480." Mark Brown expressly agreed that restitution would be due and payable immediately.

58. As soon as Mark Brown signed the plea agreement, at the latest, he knew he would owe the United States $445,480 in restitution. Yet, he continued to pay the Carrs for the loan that the Carrs took out and secured with the Carrs' Massachusetts property for the construction of the Carrs' in-law suite at the Falls Forest Property. Additionally, and notwithstanding his agreement to pay nearly half

13

a million dollars in restitution to the victim of his crime, Mark Brown continued to pay the Carrs amounts beyond what the Browns owed the Carrs for the Falls Forest Property and the Fanning Drive Property Loan.

59.     On February 16, 2017, pursuant to his written plea agreement, Mark Brown waived indictment and pled guilty in United States District Court to the charged offense in the Criminal Information.

60.     On March 20, 2018, Mark Brown was sentenced to 30 months' imprisonment and three years' supervised release, and was ordered to pay $445,480 in restitution and a $100 special assessment.  The Court ordered Mark Brown's special assessment and restitution due and payable in full immediately.

61.     At the time of sentencing, Mark Brown acknowledged that his home, the Falls Forest Property, was purchased with the Carrs.  Additionally, he admitted that although the Falls Forest Property was not in the Browns' names, the Browns were responsible for the home maintenance and mortgage.  At the time of sentencing, Mark Brown believed that he would qualify to take out a substantial home equity loan on the Falls Forest Property to pay his total restitution.

62.     Upon information and belief, at the time of his sentencing Mark Brown was insolvent and had a negative cash flow each month.

**H.     Despite Court-ordered restitution, Mark Brown failed to make any voluntary payments to the victim of his crime, but continued to fraudulently transfer funds to the Carrs.**

63.     Mark Brown has altogether failed to make any voluntary payments towards his federal restitution debt.  Yet, even after the Court ordered his restitution

14

due and payable in full immediately, he continued to pay the Carrs for the loan that the Carrs took out and secured with the Carrs' Massachusetts property for the construction of the Carrs' in-law suite at the Falls Forest Property. Additionally, and notwithstanding the Court's restitution order, Mark Brown continued to pay the Carrs amounts beyond what the Browns owed the Carrs for the Falls Forest Property and the Fanning Drive Property Loan.[1]

64.　　In an effort to collect Mark Brown's Court-ordered restitution the United States began investigating Mark Brown's ownership interest in the Falls Forest Property.

65.　　On September 7, 2018, the United States filed a "Notice of Lien for Fine or Penalty" ("Notice of Lien") with the Wake County Clerk of Superior Court, under file number 18-M-3576. The lien named Dr. Carr and Dr. Gibbons-Carr, Trustees of the Michele V. Gibbons-Carr Revocable Trust, u/t/d/ February 12, 2016, as Nominees for Mark Brown.

66.　　The United States' investigation into Mark Brown's ownership interest in the Falls Forest Property consisted of subpoenaing documents from several banks, Ayanna Carr-Brown, and the Carrs. Additionally, the United States deposed Ayanna Carr-Brown on August 24, 2019, and the Carrs on October 30, 2019.

67.　　On December 30, 2019, after assessing the available evidence and reviewing the deposition testimony of Ayanna Carr-Brown and the Carrs, the United

---

[1] Mark Brown has paid the forfeiture amount ordered by the Court, which was $178,192.00 [D.E. 36, 45].

States released the lien naming Dr. Carr and Dr. Gibbons-Carr, Trustees of the Michele V. Gibbons-Carr Revocable Trust, u/t/d/ February 12, 2016 as a nominee for Mark Brown. A copy of the Certificate of Release of Lien is attached as Exhibit D, and incorporated herein by reference.

## I. The Browns' Default and the Carrs' Termination of the Installment Contract

68. The Browns failed to make their monthly payments under the Installment Contract in October, November, and December of 2018, and January of 2019.

69. On February 26, 2019, the Carrs sent a default letter to the Browns. In the letter, the Carrs explained to the Browns that "[u]nder the terms of the Installment Contract, [the Browns] were required to make the monthly payments on the loans *we* took out to purchase the [Falls Forest Property]. Currently, you are over four months in arrears in the required payments." (emphasis added). Additionally, the letter stated that the Carrs were "giving the [Browns] notice of default and declaring the entire indebtedness remaining due under the Installment Contract now due and payable in full." The default letter is attached as Exhibit E, and is incorporated herein by reference.

70. In the default letter, the Carrs explained that the Browns had five days to pay the entire balance under the Installment Contract, or the Carrs would terminate the Browns' interest in the Falls Forest Property.

71.   The Browns failed to pay the entire outstanding balance under the Installment Contract within the 5-day timeframe provided for in the Carrs' default letter.

72.   On March 5, 2019, the Carrs terminated the Installment Contract by a Termination of Memorandum of Real Estate Contract ("termination memorandum"). The termination memorandum was recorded in the Registry of Deeds for Wake County, North Carolina, on March 18, 2019. A copy of the termination memorandum is attached as Exhibit F, and is incorporated herein by reference.

73.   The notice of default and termination memorandum are entirely inconsistent with the Carrs' history of failing to enforce the Installment Contract.

74.   On information and belief, on more than one occasion before October 2018, more than 60 days passed between the Browns' payments under the Installment Contract. On those occasions, the Carrs did not issue a default notice, terminate the Installment Contract, or terminate the Browns' interest in the Falls Forest Property. All of that changed once the United States started investigating the Browns' ownership interest in the Falls Forest Property. When the Browns defaulted in that context, the Carrs promptly issued a default letter and recorded a termination memorandum.

75.   After the Carrs recorded the termination memorandum, Ayanna Carr-Brown made two additional payments to the Carrs for the Fall Forest Property. In May 2019, Ayanna Carr-Brown signed a $4,125 check that was deposited into the Carrs' bank account. In August 2019, Ayanna Carr-Brown signed another $4,000

17

check that was made payable to the Carrs. On that August 2019 check, Ayanna Carr-Brown wrote the phrase "Use & Occupancy" in the memo line.

76. Dr. Gibbons-Carr instructed Ayanna Carr-Brown to use the phrase "Use & Occupancy" in the memo line of the August 2019 check referenced in the preceding paragraph.

**J. Mark Brown's Fraudulent Transfers to the Carrs.**

77. Mark Brown fraudulently transferred money to the Carrs that was used to pay for the loan that the Carrs took out and secured with the Carrs' property, and which was used to construct an in-law suite addition to the Falls Forest Property that was designed, used, and maintained exclusively by the Carrs (not the Browns).

78. Despite Dr. Gibbons-Carr's contention that the Browns were responsible to pay half of the cost of the in-law suite addition because it was an improvement to the Falls Forest Property, the Browns were never contractually obligated to pay any amount on the loan that the Carrs took out, secured with the Carrs' property, and used to construct the Carrs' own in-law suite. In fact, the Carrs contend the Browns *never* had any ownership interest in the Falls Forest Property at all.

79. Each payment that Mark Brown made toward the Carrs' secured loan for the construction of the Carrs' in-law suite was a fraudulent transfer, beginning in April 2014, when Mark Brown's criminal activity began, up until May of 2018, when Mark Brown reported to prison.

80. Mark Brown fraudulently transferred at least $40,000 to the Carrs to repay a loan that the Carrs took out, secured with their own Massachusetts property,

18

and used to construct their own in-law suite at the Falls Forest Property that the Carrs (not the Browns) own.

81.     Mark Brown also fraudulently transferred money to the Carrs through the guise of Installment Contract payments that exceeded any amounts the Browns actually owed the Carrs, whether under the Installment Contract, for the Fanning Drive Property Loan, or for anything else.

82.     Through the excess payments described in the preceding paragraph, Mark Brown fraudulently transferred at least $32,725.62 to the Carrs.

83.     In all, Mark Brown fraudulently transferred at least $72,725.62 to the Carrs.

## K.     Mark Brown's Outstanding Restitution Debt

84.     Mark Brown has paid only $27,108.97 in restitution to the victim of his crime.  Mark Brown did not pay any of that money voluntarily; the United States has collected that entire amount through enforced collection.

85.     By contrast, Mark Brown's co-conspirators – with whom Mark Brown's restitution debt is joint and several – have paid $164,589.44 and have entered into payment agreements with the United States.

86.     As of May 11, 2020, Mark Brown owes $253,856.59 in restitution.

**FIRST CAUSE OF ACTION**
**Fraudulent Transfers**
**(28 U.S.C. § 3301, et seq.)**

87.     Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

88.     Based on the factual allegations above, the transfers of funds by Mark Brown to the Carrs used to repay the Carrs' secured loan for the in-law suite, and in excess of any amounts the Browns actually owed the Carrs were fraudulent because the payments were made after Mark Brown incurred a debt to the United States; Mark Brown made the transfers without receiving reasonably equivalent value in exchange; and Mark Brown was insolvent at the time of the transfers or became insolvent as a result of the transfers.  See 28 U.S.C. § 3304(a).

89.     Based on the factual allegations above, the transfers of funds by Mark Brown to the Carrs used to repay the Carrs' secured loan for the in-law suite, and in excess of any amounts the Browns actually owed the Carrs was fraudulent because Mark Brown did not receive reasonably equivalent value in exchange for the transfers, and Mark Brown intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.  See 28 U.S.C. § 3304(b)(1)(B).

90.     Based on the factual allegations above, Mark Brown's transfers of funds to the Carrs used to repay the Carrs' secured loan for the in-law suite, and in excess of any amounts the Browns actually owed the Carrs was fraudulent because Mark Brown made the transfers to the Carrs with the actual intent to hinder, delay, or defraud a creditor (the United States), because, among other things, (1) the transfers were made to an insider (the Carrs); (2) the transfers were concealed; (3) before Mark Brown made the transfers to the Carrs, he had been sued or threatened with suit; (4) Mark Brown was insolvent or became insolvent shortly after the transfers were made;

20

and (5) Mark Brown's transfers of funds to the Carrs occurred shortly before or shortly after Mark Brown incurred a substantial debt. See 28 U.S.C. §§ 3304(b)(1)(A) and 3304(b)(1)(2).

91.     In sum, Mark Brown fraudulently transferred funds to the Carrs, and the United States is entitled to (1) avoid each transfer, (2) a remedy under Title 28, United States Code, Chapter 176 against the assets transferred or other property of the Carrs, or (3) any other relief that the circumstances may require. 28 U.S.C. § 3306.

## SECOND CAUSE OF ACTION
### Surcharge
### (28 U.S.C. § 3011)

92.     Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

93.     The United States has had to engage in proceedings under the Federal Debt Collection Procedure Act in order to attempt to collect the judgment against Mark Brown. These efforts include the filing of two liens, the issuance of approximately 15 subpoenas, the taking of approximately 4 depositions, the filing of 4 applications for writs of garnishments, and the filing of this action.

94.     Pursuant to 28 U.S.C. § 3011, the United States is entitled to a surcharge of ten percent (10%) of the amount of the judgment, which is $25,385.66, against Mark Brown.

# **PRAYER FOR RELIEF**

Wherefore, the United States respectfully requests that the Court enter judgment in favor of the United States and against Defendants, as follows:

1.      That the Court find that Mark Brown fraudulently transferred funds to the Carrs, through the payments Mark Brown made on the Carrs' secured loan taken out for the construction of the in-law suite addition to the Falls Forest Property, and for the overpayments that Mark Brown made to the Carrs in excess of any amounts actually owed.

2.      That the Court enter judgment against the Carrs, jointly and severally, in the amount of at least $72,725.62 , plus interest on the judgment at the legal rate until paid in full, pursuant to 28 U.S.C. § 1961.

3.      That a judgment be entered against Mark Brown for a ten percent (10%) surcharge on his criminal restitution debt as allowed by law, in the amount of $25,385.66.

4.      That the costs of this litigation, including attorney's fees, be taxed against the Carrs.

5.      For such other and further relief as the Court deems just and proper.

Respectfully submitted, this 13th day of May, 2020.

ROBERT J. HIGDON, JR.
United States Attorney


By: /s/ Asia J. Prince
ASIA J. PRINCE
Assistant United States Attorney
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
Email: Asia.Prince@usdoj.gov
N.C. Bar #48019


BY: /s/ Lauren A. Golden
LAUREN A.GOLDEN
Assistant United States Attorney
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4870
Facsimile: (919) 856-4821
Email: Lauren.Golden@usdoj.gov
N.C. Bar # 43071